1  RONALD D. ARENA, Bar No. 218421
   MICHAEL B. MOORE, Bar No. 319001
2  ARENA HOFFMAN LLP
   220 Montgomery Street, Suite 905
3  San Francisco, CA 94104
   Telephone: 415.433.1414
4  Facsimile: 415.520.0446
   Email:    rarena@arenahoffman.com
5             mmoore@arenahoffman.com

6  Attorneys for Defendant
   REDFIN CORPORATION

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  JASON BELL, individually and on          Case No. 3:20-cv-02264-AJB-AGS
    behalf of all others similarly situated,
12                                           **DECLARATION OF JANE ANNE**
                Plaintiff,                   **KARP IN SUPPORT OF MOTION TO**
13                                           **COMPEL ARBITRATION AND**
         v.                                  **REQUEST TO STAY ACTION**
14
    REDFIN CORPORATION,
15                                           Courtroom:      4A
                Defendant.
16
                                             Hon. Anthony J. Battaglia
17

18

19      I, Jane Anne Karp, declare and state as follows:

20      1.      I am Director of Human Resources for Redfin Corporation. I make this

21  declaration in support of Defendant Redfin Corporation's ("Redfin" or the "Company")

22  Motion to Compel Arbitration and Request to Stay Action. This declaration is based

23  upon my own personal knowledge and my review of Company records over which I

24  have responsibility in my capacity as Director of Human Resources. If called upon to

25  testify regarding the matters set forth herein, I could and would competently do so.

26      2.      Redfin is a national real estate brokerage, representing buyers and sellers

27  of residential real estate. In my capacity as Director of Human Resources, I am familiar

28  with the job responsibilities and duties for the various sales-related positions within

ARENA HOFFMAN LLP
220 Montgomery Street
Suite 905
San Francisco, CA 94104
415.433.1414

KARP DECL. ISO REDFIN'S MOTION TO          Case No. 3:20-cv-02264-AJB-AGS
COMPEL ARBITRATION

Redfin. I am also familiar with Redfin's business model and real estate operations Company-wide.

3. Although there are, and have been, many Redfin job descriptions and positions related to the real estate sales process, the most common job titles for Redfin agents include "Associate Agent," "Agent," "Senior Agent," "Support Agents," and "Team Lead," all of whom perform services as licensed real estate salespersons. "Associate Agents," formerly known as "Field Agents," are independent contractors licensed to sell real estate who perform certain discreet tasks, such as conducting home tours for customers who in many cases have already met and toured with the lead agent, attending home inspections, attending key exchanges, and the like. "Support Agents" are licensed real estate salespersons paid by the hour whose primary responsibility is to field client calls and respond to emails related to the sales process.

4. "Agents," "Senior Agents," and "Team Leads" are generally considered "deal writing agents," the agents who, generally speaking, are responsible for interfacing with clients during key aspects of the sales process, preparing offer proposals and documentation, negotiating sales contracts, and closing transactions. Deal writing agents are licensed real estate salespeople within the various U.S. jurisdictions within which Redfin operates. Deal writing agents enjoy a great deal of discretion with regard to how to go about selling real estate and where to spend their time doing it. Although Redfin expects deal writing agents to close a minimum number of transactions per month depending on type of position and experience level, how the agents go about achieving this metrics is within their discretion, subject to supervisory control by area and market managers. It is also important that deal writing agents spend as much time in the field meeting with clients as they can, particularly during key phases of the sales process.

5. In my capacity as Director of Human Resources, I am responsible for, among other things, knowing how to access information about Redfin real estate agents

ARENA HOFFMAN LLP
220 Montgomery Street
Suite 905
San Francisco, CA 94104
415.433.1414

KARP DECL. ISO REDFIN'S MOTION TO COMPEL ARBITRATION          2.          Case No. 3:20-cv-02264-AJB-AGS

employed by Redfin.  At the time Plaintiff Jason Bell ("Plaintiff") signed the Employee Assignment, Arbitration and Confidentiality Agreement, he was engaged as an employee "Agent."  Although no deadline was given for signing the Agreement, signing the Agreement was a requirement for continued employment.

6.     Various human resources records, including personnel and payroll records, for employees like Plaintiff are maintained on an electronic database to which I have access in my capacity as Director of Human Resources.  Attached hereto as Exhibit A is a true and correct copy of the Employee Assignment, Arbitration and Confidentiality Agreement on file for Plaintiff that he electronically signed on November 30, 2018.

7.     Exhibit A is maintained in the usual course of business for Redfin.  This record is kept by Redfin in the regular course of business, and it was the regular course of business of Redfin for an employee or representative of Redfin with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the records or to transmit information thereof to be included in such records; and the records were made at or near the time or reasonably soon thereafter.  The record attached hereto is the original or exact duplicate of the original.

8.     Plaintiff signed the Agreement through DocuSign, a web-based electronic signature service.  Redfin real estate agents such as Plaintiff are required to use and be familiar with DocuSign as part of their ordinary job junctions.  Many documents that require signatures as part of the home buying or selling process at Redfin are signed using DocuSign.

9.     The procedure for employee real estate agents such as Plaintiff to sign Company documents using DocuSign is simple.  Redfin sends an email using the DocuSign web portal.  Redfin sends the email to the email address provided upon recruitment, in this case, owedto*****@gmail.com.  I placed asterisks on the last 5 characters of Plaintiff's personal email address to respect his privacy.  Within the web portal, boxes are checked to indicate where the agent is required to sign.  At each box

ARENA HOFFMAN LLP
220 Montgomery Street
Suite 905
San Francisco, CA 94104
415.433.1414

KARP DECL. ISO REDFIN'S MOTION TO COMPEL ARBITRATION          3.          Case No. 3:20-cv-02264-AJB-AGS

checked, the agent is given an option to accept the terms of the Agreement by affixing an electronic signature. The agent can use a default font for the signature or use their own customized image for the signature. Once acceptance is indicated by the agent, the signature is electronically affixed and the date of the signature is indicated in the appropriate box, in this case, November 30, 2018. The agent and a Company representative, in this case, President of Real Estate Operations Scott Nagel, then each receive an email indicating that the document has been reviewed and completed. A copy of the Agreement can be downloaded from the email as a .pdf document or by accessing the DocuSign web portal.

10. Based on my position within the Company and knowledge of the process for obtaining signatures on the Employee Assignment, Arbitration and Confidentiality Agreement, I can verify that the signature on Exhibit A is that of Jason Bell.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____12/2/2020_____, at Seattle, WA.

DocuSigned by:

Jane Anne karp

F17581F40F4E4EF...

JANE ANNE KARP

ARENA HOFFMAN LLP
220 Montgomery Street
Suite 905
San Francisco, CA 94104
415.433.1414

KARP DECL. ISO REDFIN'S MOTION TO COMPEL ARBITRATION          4.          Case No. 3:20-cv-02264-AJB-AGS

# EXHIBIT A

# EMPLOYEE ASSIGNMENT, ARBITRATION
# AND CONFIDENTIALITY AGREEMENT

In consideration of, and as a condition of my employment beginning, or if already employed, my employment continuing with Redfin Corporation or one of its wholly-owned subsidiaries (collectively, the "*Company*"), I hereby represent to the Company, and the Company and I agree as follows:

      **1.**    *Changes in Position, Compensation and Employer.* This Employee Assignment, Arbitration and Confidentiality Agreement (this "*Agreement*") will apply to my current and any future positions at the Company to which I may be assigned, and it will continue to apply notwithstanding any changes in my job duties or compensation.

      **2.**    *Company Business.* The Company is a full service real estate brokerage providing real estate services through real estate licensees as well as through a searchable website. These services include, but aren't limited to, locating residential real property for prospective buyers and assistance to homeowners for the selling of residential real property; specifically, providing assistance with documentation, forms, offers and negotiations for the purchase and sale process. Additionally, Company services include, without limitation, providing tracking data on existing purchase and sale transactions, providing real estate marketing services, arrangement of tours for prospective buyers, instruction in the form of providing home buying/selling classes as well as providing market analysis and research. I understand that the Company and its affiliates are engaged in a continuous program of research, development, production and marketing in connection with their business and that, as an essential part of my employment with the Company, I will be given access to information pertaining to such matters and may be expected to make new contributions to and create inventions of value for the Company.

      **3.**    *Disclosure of Inventions.* From and after the date I first become employed with the Company, I will promptly disclose in confidence to the Company all inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works and trade secrets related to the business of the Company as it is conducted or planned to be conducted on the date thereof ("*Inventions*"), whether or not patentable, copyrightable or protectable as trade secrets, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment.

      **4.**    *Work for Hire; Assignment of Inventions.* I agree that all Inventions that (i) are developed using equipment, supplies, facilities or trade secrets of the Company, (ii) result from work performed by me for the Company or (iii) relate to the Company's business or current or anticipated research and development, will be the sole and exclusive property of the Company and constitute "work made for hire" under U.S. copyright law and to the extent not "work made for hire" are hereby assigned by me to the Company ("*Assigned Inventions*").

DocuSign Envelope ID: E3324B0C-CD25-4C69-8157-3EFAFD80B581

**5.** ***Assignment of Other Rights.*** To the maximum extent permitted by law, I hereby irrevocably transfer and assign to the Company: (a) all worldwide patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights in any Assigned Invention; and (b) any and all Moral Rights (as defined below) that I may have in or with respect to any Assigned Invention. I also hereby forever waive and agree never to assert any and all Moral Rights I may have in or with respect to any Assigned Invention, even after termination of my work on behalf of the Company. "*Moral Rights*" mean any rights to claim authorship of an assigned Invention or to restrain or object to any modification of any Assigned Invention, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

**6.** ***Excluded Inventions and Other Inventions***. The Acknowledgement and Signature Page hereto contains a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by me or acquired by me prior to the Effective Date (as defined in Section 29, below), and which are not to be assigned to the Company ("*Excluded Inventions*"). If no such list is attached, I represent and agree that it is because I have no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development. I acknowledge and agree that if, in the scope of my employment, I use any Excluded Inventions or any Inventions that are not assignable ("*Other Inventions*"), or if I include any Excluded Inventions or Other Inventions in any product or service of the Company or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, I will immediately so notify the Company in writing. Unless the Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to the Company, in such circumstances (whether or not I give the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense to third parties in one or more tiers of sublicensees with the same rights.

**7.** ***Exception to Assignment***. I understand that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention that qualifies fully for exclusion under applicable state law as set forth in the attached Exhibit A.

**8.** ***Assistance.*** I agree to assist the Company in every way to obtain for the Company and enforce all legal protections for the Assigned Inventions in any and all countries. I will execute any documents that the Company may reasonably request for use in obtaining or enforcing any such legal protections in and to the Assigned Inventions. My obligations under this paragraph will continue beyond the termination of my employment with the Company, provided that the Company will compensate me at a reasonable rate after such termination for time or expenses actually spent by me at the Company's request for such assistance. I appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for all purposes under this paragraph.

**9.** ***Confidentiality.***

DocuSign Envelope ID: E3324B0C-CD25-4C69-8157-3EFAFD80B581

A. *Definition of Proprietary Information*. I understand that "Proprietary Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business, or which relates to the business of any affiliate, client, customer, or supplier of the Company, or any other party with whom the Company agrees to hold information of such party in confidence, whether recorded or merely memorized, and which is not generally known and which the Company wishes to maintain as confidential. Proprietary Information includes information disclosed by the Company to me, as well as information developed or learned by me during the course of my employment with the Company. Proprietary Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Proprietary Information. By example, and without limitation, Proprietary Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or known-how, including, but not limited to, research, product plans, non-public data and information related to prospective or pending real estate transactions, or other information regarding the Company's products or services and markets therefor. Proprietary Information also includes, without limitation, Assigned Inventions, marketing plans, product plans, computer software (including but not limited to source code), business strategies, financial information, forecasts, protectable or private personnel information, as well as customer lists, customer identifying information, and customer contact information (including but not limited to customers of the Company on which I called or with which I may become or became acquainted during the term of my employment). Notwithstanding the foregoing, Proprietary Information will not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company to me; (ii) becomes publicly known or made generally available after disclosure by the Company to me through no wrongful action or omission by me; (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by the Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the wages, terms, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure*. I agree that, both during my employment and after my employment with the Company ends, I will hold in the strictest confidence, and will take all reasonable precautions to prevent any unauthorized use or disclosure of Proprietary Information, and I will not (i) use any Proprietary Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose any Proprietary Information to any third party without prior written authorization of an authorized officer of the Company. Upon termination of my employment with the Company or at any time at the request of the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to any Assigned Invention or Proprietary Information, and document in writing that I have complied with this Section 9(B). I will not take with me any documents or materials or copies thereof containing any Proprietary Information and will return all copies of such documents and materials in my possession to the Company. I agree that I obtain no title to any Proprietary Information, and that as between the Company and myself, the Company retains all Proprietary Information as its sole property. I understand that my legal obligations under this section will continue after the termination of my employment.

**10.** *No Breach of Prior Agreement.* I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, restrictive covenant or similar agreement or any other obligation that I may owe any former employer or other party. I represent and agree that I will not bring with me to the Company any documents or materials of a former employer that are not generally available to the public or have not been legally transferred to the Company. I will not use in the course of my employment with the Company any intellectual property of any former employer or third party, whether recorded or merely memorized, in violation of any of the rights of such party.

**11.** *Notification.* I hereby authorize the Company to notify my actual or future employers of the terms of this Agreement and my responsibilities hereunder.

**12.** *Duty of Loyalty/Customer Relationships.*

A. While employed at the Company I will not, directly or indirectly: (a) accept employment or engage in activities competitive with products, services, technology, product features or projects (including actual or demonstrably anticipated research or development) on which I worked or about which I learned Proprietary Information or trade secrets while employed at the Company; (b) render competitive services in any capacity other than on behalf of the Company to any client or customer of the Company for which I performed services during my employment with the Company; (c) contact any of the suppliers or customers of the Company or its subsidiaries for the purpose of soliciting orders or establishing relationships for any business enterprise that engages in activities competitive with products, services, technology, product features or projects (including actual or demonstrably anticipated research or development) on which I worked or about which I learned Proprietary Information or trade secrets while employed at the Company; or (d) contact any of the suppliers or customers of the Company or its subsidiaries for the purpose of diverting or attempting to divert business away from the Company. In addition, I will not, any time after the date of the termination of my employment, use any corporate or trade name, mark or style which may suggest a connection with the Company or any of its affiliates or which is similar to any corporate or trade name, mark or style used by the Company or any of its affiliates.

B. Further, I understand and agree that, while employed, I will be in a position to develop relationships with customers and potentially secure various real estate transactions (whether for sale or purchase), and that I will be developing customer relationships and sales transaction opportunities while being paid by the Company, and using the Company's resources and Proprietary Information. I further acknowledge and understand that while employed by the Company, and except where subject to Company's personal transactions policy, all opportunities, including customer relationships and sale transactions, are the Company's opportunities, despite the fact that the particular customer relationship or sales transaction might have been identified or sustained by me personally. As such, I agree that all sales transactions I identify, and customer relationships I enter into while employed, are opportunities and relationships of the Company, will remain opportunities and relationships of the Company even after my employment ends, and are not and will not be relationships or opportunities that belong to me or in which I have any rights. Notwithstanding the foregoing, customer relationships that I can demonstrate in writing that I had established before beginning my employment with Redfin are not Company opportunities.

13.    *Real Estate Duties and Obligations.*

(a)    All customers and listings of property, and all agreements, communications, acts or actions for performance of real estate related services, which are serviced, taken or performed in connection with this Agreement, will be serviced, taken and performed in the name of Company, on behalf of the Company, and for the Company's benefit. I agree to and do hereby contribute all right and title to such customers and listings to Company and for the benefit and use of Company.

(b)    I will work diligently and with my best efforts to: (i) purchase, sell, list, exchange, lease, or rent properties for the benefit of Company; (ii) solicit additional listings, clients, and customers; and (iii) otherwise promote the business of serving the public in real estate transactions to the end that Company may derive the greatest benefit possible, in accordance with law.

(c)    All files, documents and things pertaining to listings, leads, transactions and Company—including client lists and contact information, transaction files, lockboxes, phones, tablets, MLS login credentials, services subscriptions, and other Company equipment or documents ("Transaction Information") are the property of Company and will be delivered to Company by me immediately upon request or termination of this Agreement.

(d)    I agree that within 24 hours after preparing, signing or receiving any Transaction Information, I will submit to Company: (i) all documents which may have a material effect upon the rights and duties of principals in the transaction; (ii) any documents or other items connected with a transaction pursuant to this Agreement in my possession or available to me; and (iii) all documents associated with any real estate transaction in which I am a principal.

(e)    I acknowledge that Company's method of conducting its real estate operations business, including the design and operation of Company's agent-facing software technology, is a protected trade secret and constitutes Proprietary Information.

(f)    I will not use to my own advantage, or the advantage of any other person, business, or entity, except as specifically agreed in writing, either during my employment with Company, or thereafter, any information gained for or from the business or the files of Company, or gained during the course of my employment with the Company, including without limitation, any Proprietary Information.

(g)    If my employment with the Company is terminated while I have listings, customers or pending transactions that require further work normally rendered by a real estate agent, Company will make arrangements to have another real estate agent perform the work. I acknowledge that all customers for whom I provide real estate services on behalf of Company are, and will remain after my termination, Company customers.

(h)    Company or I may terminate my employment at any time, with or without cause. After my employment is terminated for any reason, I will not use any Proprietary Information obtained during my employment with the Company, including any information related to Company-generated leads, clients or customers to: (i) solicit prospective or existing Company clients or customers or interfere with the contractual obligations or contractual relationship between such clients or customers and the Company; (ii) interfere with any other existing contractual obligations

between the Company and any other third-party, including but not limited to any contractual obligation entitling the Company to receive payment or compensation. After the termination of my employment, this Agreement will continue to govern all disputes and claims between Company and me connected with this Agreement, including obligations and liabilities arising from existing and completed listings, transactions and services.

(i)     I further acknowledge and agree that, following the termination of my employment with the Company, any information related to a transaction which was initiated prior to the termination of my employment by a Company client or customer and which constitutes Proprietary Information remains the sole property of the Company and is subject to the protections and obligations in Section 9.B and 12.B above.

(j)     I further acknowledge and agree—in recognition of Company's significant efforts to generate client and customer leads through its website, mobile application and marketing— that for every purchase and/or sale transaction I close within twelve (12) months following my termination from Company for a prospective or existing client or customer introduced to me through Company during the time of my employment with Company, and even if my participation in such purchase and/or sale transaction is not a violation of this Agreement, I will pay to Company within thirty (30) calendar days of the consummation of such transaction a referral fee equal to fifty percent (50%) of all commissions, bonuses and/or compensation I earn. Any action to enforce this Paragraph 13(j) shall be resolved through the arbitration procedures outlined in Paragraph 18, *et seq.* .Should Company find it necessary to institute any action, arbitration or proceeding arising from or relating to my failure to pay any such referral fees owed, Nothing in this Paragraph 13(j) shall be construed to interfere with vested commissions or other forms of compensation where all conditions precedent to earning have been satisfied.

**14.    *Non-Solicitation of Employees/Consultants.*** While employed at the Company, and for a period of one (1) year thereafter, I will not, directly or indirectly solicit away employees or consultants of the Company for my own benefit or for the benefit of any other person or entity, nor will I encourage or assist others to do so.

**15.    *Use of Name and Likeness.*** I hereby grant Company the perpetual, irrevocable, worldwide, sub-licensable, right and license to use my name, voice, photograph, likeness, biographical data or other identification, and any reproduction or simulation of any of the foregoing, in any form of media or technology now known or hereafter developed for any purpose related to Company's business, such as marketing, advertising, credits and presentations.

**16.    *Telephone and Text Authorization.*** I authorize Company to call, text, or otherwise contact me, including by means of automated systems such as an Automatic Telephone Dialing System, at a mobile telephone number I will provide to Company, for the purpose of connecting me with potential clients and for other purposes beneficial to the mutual business interests of me and Company. This consent and authorization will remain in place unless and until expressly revoked.

**17.    *U.S. Defend Trade Secrets Act Notice of Immunity.*** The U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an

attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, the DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

### 18. *Mutual Agreement to Arbitrate.*

(a)     It is hereby acknowledged and agreed that this Agreement is entered into pursuant to, and is governed by, the Federal Arbitration Act, and I and Company mutually agree to submit to mandatory binding arbitration any and all claims arising out of or related in any way to my employment or termination thereof, compensation, stock options, any actual or implied agreements between the parties, the relationship between the parties, and this Agreement (collectively, "*Arbitrable Claims*"). Further, to the fullest extent permitted by law, I and Company agree that no class or collective actions can be asserted in arbitration or otherwise, except for claims under the California Private Attorneys General Act ("PAGA"), which may be brought in any forum permitted by law. All other, non-PAGA claims, whether in arbitration or otherwise, must be brought solely in my or Company's individual capacity, and not as a plaintiff or class member in any purported class or collective proceeding.

SUBJECT TO THE ABOVE, THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS. THE PARTIES FURTHER WAIVE ANY RIGHTS THEY MAY HAVE TO PURSUE OR PARTICIPATE IN A CLASS OR COLLECTIVE ACTION PERTAINING TO ANY CLAIMS BETWEEN THEM, EXCEPT AS PROVIDED ABOVE.

(b)     The arbitration will be conducted through JAMS before a single neutral arbitrator. I agree that any arbitration will be administered by Judicial Arbitration & Mediation Services, Inc. ("JAMS"), pursuant to its employment arbitration rules & procedures (the "JAMS Rules"), a copy of which is available at http://www.jamsadr.com/rules-employment-arbitration/ and from Human Resources. The arbitrator will have the sole and exclusive authority to determine the arbitrator's jurisdiction and the application of this Agreement to any dispute between the parties. The arbitrator will have the sole and exclusive authority to determine the enforceability of this Agreement and any provisions contained herein. The arbitrator will have the sole and exclusive authority to determine questions of procedural and/or substantive unconscionability. The arbitrator will issue a written decision that contains the essential findings and conclusions on which the decision is based.

(c)     Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law, including the recovery of attorneys' fees and costs where provided by law. However, in all cases where required by law, Company will pay the arbitrator's and arbitration fees. If under applicable law Company is not required to pay all of the arbitrator's and/or arbitration fees, such fee(s) will be apportioned between the parties in accordance with applicable law, and any disputes in that regard will be resolved by the arbitrator.

DocuSign Envelope ID: E3324B0C-CD25-4C69-8157-3EFAFD80B581

(d)    A demand for arbitration must be in writing and delivered by hand or first class mail to the other party within the applicable statute of limitations period. Any demand for arbitration made to Company will be provided to Redfin's Legal Department, 1099 Stewart St., Suite 600, Seattle, WA 98101. The arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration. In arbitration, the parties will attempt to agree on the procedural rules to be used to govern the arbitration proceeding, subject to approval by the arbitrator. If the parties cannot reach such an agreement, the state rules of civil procedure applicable in the state in which the arbitration is held will apply. In all cases, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard will be resolved by the arbitrator.

(e)    Within 30 days of the close of the arbitration hearing, any party will have the right to prepare, serve on the other party and file with the arbitrator a brief. The arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. The arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the arbitrator, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties. A court of competent jurisdiction will have the authority to enter a judgment upon the award made pursuant to the arbitration. The arbitrator will not have the power to commit errors of law or legal reasoning.

**19.    *Voluntary Nature of Agreement.*** I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. I further acknowledge and agree that I have carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences, and binding effect of this Agreement and fully understand it, including that *I am waiving my right to a jury trial, and that I am waiving my right to either bring or participate in a class or collective action*. Finally, I again agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.

**20.    *Severability.*** If any provision of this Agreement or compliance by any of the parties with any provision of this Agreement constitutes a violation of any law, or is or becomes unenforceable or void, then such provision, only to the extent that it is in violation of law, unenforceable or void, will be deemed modified to the extent necessary so that it is no longer in violation of law, unenforceable or void, and such provision will be enforced to the fullest extent permitted by law. If such modification is not possible, said provision, to the extent that it is in violation of law, unenforceable or void, will be deemed severable from the remaining provisions of this Agreement, which provisions will remain binding on the parties.

**21.    *Governing Law; Venue.*** This Agreement and its validity, construction, and performance will be governed by the laws of the state where I reside at the commencement of my employment (the "*State of Residence*"), without giving effect to any choice of law principles, except that Paragraph 15 governing the mandatory arbitration clause and procedure will be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section, 1 *et seq.*

DocuSign Envelope ID: E3324B0C-CD25-4C69-8157-3EFAFD80B581

22. ***Binding Effect***. This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective heirs, affiliates, successors and assigns. The Company may assign any of its rights and obligations under this Agreement. I understand that I will not be entitled to assign or delegate this Agreement or any of my rights or obligations hereunder, whether voluntarily or by operation of law, except with the prior written consent of the Company.

23. ***Entire Agreement***. This Agreement constitutes the final and entire agreement among the parties with respect to the subject matter hereof and supersedes all prior arrangements or understandings.

24. ***Amendment.*** The terms of this Agreement may not be modified or amended, or any provisions hereof waived, temporarily or permanently, except pursuant to the written agreement of the parties hereto.

25. ***No Duty to Employ.*** I understand that this Agreement does not constitute a contract of employment or obligate the Company to employ me for any stated period of time and I understand and agree that my employment is at-will, which means that either I or the Company may terminate my employment at any time for any reason, with or without cause or advance notice.

26. ***Other Obligations.*** I hereby acknowledge that my obligations under this Agreement are supplemental to and not in place of other obligations that I may owe the Company under applicable statutes, laws and regulations.

27. ***Continuing Nature of Obligations.*** My obligations under this Agreement are perpetual and will not terminate upon the termination of my employment, regardless of the reason for termination or the party that initiated such termination.

28. ***Counterparts***. This Agreement may be executed in two or more counterparts each of which will be deemed an original and will bind the signatory, but all of which together will constitute but one and the same instrument.

29. ***Effective Date of Agreement***. This Agreement is and will be effective on and after the earlier of the first day of my employment by the Company and the date(s) set forth on the signature page below (the "*Effective Date*").

**[Acknowledgment and Signature Page Follows]**

## ACKNOWLEDGMENT AND SIGNATURE PAGE

I acknowledge that I have read and understand this Employee Assignment, Arbitration and Confidentiality Agreement. I further acknowledge that I have been advised by Company that I am entitled to have an attorney of my own selection review this Agreement, at my own expense, prior to signing, and that I have done so or have elected to forego that right. In consideration of the wages paid to me and other good and valuable consideration, I do hereby agree to abide by the terms of this Agreement.

**COMPANY**

By: _____

Name: Scott Nagel

Title: President of Real Estate Operations

**EMPLOYEE**

_____
Signature

Jason Bell
Name (Please Print)

11/30/2018
Date

---

### LIST OF EXCLUDED INVENTIONS

_____ I have prior inventions, improvements, and/or original works of authorship, which I agree to list and describe in an email to people-help@redfin.com within seven (7) days of the effective date of the Agreement.

_____ I have no prior inventions, improvements, or original works of authorship.

If I have not made a selection above, I have no prior inventions, improvements, or original works of authorship.

Signature of Employee: _____

Print Name of Employee: Jason Bell

DocuSign Envelope ID: E3324B0C-CD25-4C69-8157-3EFAFD80B581

## Exhibit A

***For Washington employees: RCW 49.44.140***

(1) A provision in an employment agreement which provides that an employee will assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

(2) An employer will not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

***For California employees: California Labor Code Section 2870***

Any provision in an employment agreement which provides that an employee will assign, or offer to assign, any of his or her rights in an invention to his or her employer will not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer. To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under California Labor Code Section 2870(a), the provision is against the public policy of this state and is unenforceable.

***For all employees in other states:***

The agreement to assign inventions to the Company does not apply to an invention for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on the employee's own time, except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business or to actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer.